2016 UT App 117

# THE UTAH COURT OF APPEALS

TROY M. GRANGER,
Appellee and Cross-appellant,

*v.*

CINDY D. GRANGER,
Appellant and Cross-appellee.

Amended Opinion[1]
No. 20140196-CA
Filed May 26, 2016

Third District Court, Salt Lake Department
The Honorable Kate A. Toomey
No. 114902328

David Pedrazas, Attorney for Appellant

Melissa M. Bean and Martin N. Olsen, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGES
GREGORY K. ORME and J. FREDERIC VOROS JR. concurred.

ROTH, Judge:

¶1     Cindy D. Granger (Wife) appeals several rulings of the district court in a divorce proceeding. Troy M. Granger (Husband) cross-appeals, challenging the court's denial of his request for attorney fees. We reverse and remand to the district court for further fact finding regarding the distribution of Husband's 401(k) retirement account and for entry of

---

1. This Amended Opinion replaces the Opinion issued April 7, 2016, *Granger v. Granger*, 2016 UT App 67. In response to a petition for rehearing filed by Cindy D. Granger, paragraph 27 was added with the subsequent paragraph re-numbered as paragraph 28.

appropriate findings to support its decision on the issue of attorney fees.

BACKGROUND

¶2     Husband and Wife married in 2003. Husband filed for divorce in April 2011. In his petition for divorce, Husband requested that any retirement accounts be divided in accordance with the *Woodward* formula. *See generally Woodward v. Woodward*, 656 P.2d 431, 433–34 (Utah 1982). Wife responded that any retirement benefits should be "equitably divided."

¶3     Before trial, both parties submitted trial briefs. Wife's brief stated, "Retirement accounts shall be divided pursuant to the *Woodward* formula." Husband's brief also requested division of retirement benefits according to the *Woodward* formula. Husband's brief proposed the amount he believed Wife was entitled to under the formula. However, as with a different figure Husband had provided in an earlier settlement proposal, the number was not accompanied by any explanation of how it had been calculated.

¶4     In July 2013, the district court held a two-day trial. During opening statements and closing arguments, counsel for both Husband and Wife said that the retirement accounts should be divided according to the *Woodward* formula. There was no further discussion regarding the *Woodward* formula or the division of the retirement accounts during the trial. The district court entered its findings of fact, conclusions of law, and order on September 3, 2013. In its findings of fact, the court referenced the retirement accounts once, noting that "[t]he parties stipulated to the division of their retirement accounts pursuant to the *Woodward* formula."[2] It also ordered Husband's counsel to

_____

2. It is undisputed that the only retirement funds subject to division was each party's 401(k) account. But on appeal, only Husband's 401(k) retirement account is at issue.

prepare the final decree of divorce, later signed on October 18, 2013. Following the court's order, contentions between Husband and Wife over issues unrelated to this appeal continued for months.

¶5     On January 28, 2014, Husband's counsel sent Wife's counsel a copy of the qualified domestic relations order (the QDRO[3]), which he proposed to file with the district court to implement division of the retirement account. In an email accompanying the document, Husband's counsel explained that "the retirement will be divided according to the *Woodward* formula" and, for the first time, he provided a mathematical calculation showing "how [he] arrived at the amount set forth in the QDRO." Wife's counsel responded by email later that same day, stating, "I am not sure how the figure . . . was arrived at[,] but that is completely wrong." Wife's counsel continued, "This is not working out. I simply suggest that I will draft [the] QDRO[] based upon the *Woodward* formula." Husband's counsel responded that the calculation he used was based on the *Woodward* formula, explaining that he "multipl[ied] one-half of the value of the account by the number of years the parties were married and divide[d] by the number of years [Husband] has worked." Wife's counsel responded that the calculation Husband's counsel used was "wrong" and insisted that counsel should have "simply divide[d] what was acquired during the marriage."

---

3. We explained the origin and role of a QDRO in *Bailey v. Bailey*, 745 P.2d 830, 832 (Utah Ct. App. 1987):

> The Retirement Equity Act of 1984, Pub. L. No. 98-397, 98 Stat. 1426 (1986), created the Qualified Domestic Relations Order ("QDRO"). When a divorce is granted, the parties can obtain from the trial court a QDRO. This order furnishes instructions to the trustee of a retirement plan and specifies how distributions should be made, to whom, and when.

¶6    Wife filed an objection to the QDRO as well as a motion under rule 60(b) of the Utah Rules of Civil Procedure to set aside or clarify the divorce decree. Wife also provided notice that she was issuing a subpoena to obtain records from the plan administrator of Husband's retirement account. Husband filed a response to Wife's objection to the QDRO and rule 60(b) motion and also moved to quash the subpoena. The district court granted Husband's motion to quash and set a hearing on both Wife's rule 60(b) motion to set aside the divorce decree and her objection to the QDRO.

¶7    At the hearing, Wife's counsel stated,

> I will admit that I stipulated to the *Woodward* formula. The problem that I've always had, and I guess I've had different results from all of the [c]ourts is basically it's always been my understanding the *Woodward* formula basically means you just divide whatever contributions were made to the retirement during the marriage.

Wife's counsel explained that he "never intended to use this formula of doing the number of years" but that he believed the actual mathematical formula set forth in *Woodward* applied only to defined benefit plans and not to defined contribution plans such as Husband's 401(k) retirement account. Husband's counsel argued that Wife's agreement to the *Woodward* formula was a "one-sided mistake"—if there was a mistake made at all—made entirely by Wife "because the *Woodward* formula has been around for 32 years" and "the formula is clear."

¶8    The district court took the matter under advisement and issued a written ruling in March 2014 denying Wife's rule 60(b) motion to set aside or clarify the divorce decree and her objection to the QDRO. The court determined that "the Rule 60 motion was not filed in a timely fashion, and although [Wife's] counsel may not agree with it, the *Woodward* formula does not require clarification. Moreover, [Husband's] settlement proposal

and trial brief each set forth the calculation being proposed, so it does not appear that [Wife] was unaware of what she was stipulating to when she agreed to a division of retirement contributions."

¶9 On appeal, both Husband and Wife agree that as of the date of divorce, the balance of Husband's retirement account was $591,938.64. But it is from this figure that Husband and Wife diverge. The QDRO prepared by Husband and signed by the district court divided this figure by two, multiplied the result by the number of years the parties were married (10.5 years), and then divided that result by the number of years Husband worked (18.8 years). Husband therefore concluded that $165,302.01 represents Wife's portion of the retirement account under the *Woodward* formula. Wife asserts that the $591,938.64 account balance should be reduced by Husband's premarital contributions of $193,526.04, leaving $398,412.60, which should then be divided equally with Husband and Wife each receiving $199,206.30. Wife claims that "pursuant to *Woodward*," "the portion of the retirement account accumulated during the marriage shall be equally divided" between her and Husband because "[t]o do otherwise . . . creates an injustice and inequity that was never intended by the *Woodward* Court." Wife asserts on appeal that it was only in January 2014, when she reviewed Husband's proposed QDRO in which Husband provided the actual calculations used to determine the final figure he believed was Wife's share of the retirement account, that "it became apparent that the parties intended different results [from] the division of the retirement account pursuant to *Woodward*" because "there was a serious misapplication and/or interpretation of the '*Woodward* formula'" by Husband.

ISSUES AND STANDARDS OF REVIEW

¶10 There are two primary issues on appeal. First, Wife's appeal rests on her assertion that the district court erred in dividing Husband's 401(k) retirement account under the

*Woodward* formula because, Wife contends, division under the *Woodward* formula means that the retirement account was to be "equally divided based upon marital contributions made during the marriage." "We will disturb the [district] court's division only if there is a misunderstanding or misapplication of the law . . . indicating an abuse of discretion." *Johnson v. Johnson*, 2014 UT 21, ¶ 23, 330 P.3d 704 (alteration in original) (citation and internal quotation marks omitted).

¶11 Second, Husband cross-appeals, contending the district court erred in denying his request for attorney fees related to the rule 60(b) motion and the motion to quash. Because we reverse the district court and remand for further consideration of the division of Husband's 401(k) account, Husband is no longer the prevailing party below, and his attorney fees issue related to the rule 60(b) motion and the motion to quash is essentially moot at this point. *See Osguthorpe v. Osguthorpe*, 872 P.2d 1057, 1058 (Utah Ct. App. 1994) ("Generally, we do not consider mooted questions on appeal. Whether to consider a mooted controversy is a matter of judicial policy and not law." (citation omitted)).

ANALYSIS

¶12 Generally, there are two types of pension plans: a defined benefit pension plan and a defined contribution retirement plan. The retirement account at issue is not a defined benefit plan like the pension at issue in *Woodward*. Instead it is a defined contribution plan, specifically a 401(k) retirement account that Husband had paid into before and during the marriage. In *Oliekan v. Oliekan*, 2006 UT App 405, 147 P.3d 464, we explained the difference between these two types of plans:

> A defined contribution plan is comprised of funds held in an account established by the employee through his employer. A defined contribution plan is one in which the employee and the employer both make contributions to a retirement plan

account. . . . By contrast, a defined benefit plan defines an employee's benefits as a certain amount per period of time.

*Id.* ¶ 5 n.3 (citation and internal quotation marks omitted); *see also Employee Benefit Plan*, Black's Law Dictionary (10th ed. 2014) ("Retirement benefits under a defined-benefit plan generally are based on a formula that includes such factors as years of service and compensation . . . . [A] defined-contribution plan . . . [is] funded by the employee's contributions and the employer's contributions.").

¶13 The question presented here is whether the formula devised in *Woodward v. Woodward*, 656 P.2d 431 (Utah 1982), for the division of marital property in a defined benefit plan can also be strictly applied to the division of marital property in a defined contribution plan such as Husband's 401(k) account when the only agreement between the parties was to "use the *Woodward* formula" as a basis for that division. To address this question, we first discuss some general principles of contract law and explain how those general principles fit into the overall principle of equity that Utah courts apply to property division in divorce proceedings. Next, we consider *Woodward* itself and the equitable principles that seem to underlie its decision regarding the appropriate division of marital property in a defined benefit plan. Finally, applying both contract and equitable principles, we consider whether the sparse agreement made between Husband and Wife to "use the *Woodward* formula" produces an equitable result and whether the district court adequately examined the formation of the contract to determine if the parties actually bargained for this result. We conclude they did not.

## I. Agreements Between Parties in Divorce Proceedings

¶14 "It is a basic principle of contract law there can be no contract without a meeting of the minds . . . ." *Oberhansly v. Earle*, 572 P.2d 1384, 1386 (Utah 1977). "Both parties must assent to the

same thing in the same sense . . . [; otherwise] there is no agreement." *E.B. Wicks Co. v. Moyle*, 137 P.2d 342, 346 (Utah 1943) (citation and internal quotation marks omitted). "It is fundamental that a meeting of the minds on the integral features of an agreement is essential to the formation of a contract. An agreement cannot be enforced if its terms are indefinite." *Goggin v. Goggin*, 2011 UT 76, ¶ 37, 267 P.3d 885 (citation and internal quotation marks omitted); *see also Terry v. Bacon*, 2011 UT App 432, ¶ 21, 269 P.3d 188 ("Under general contract law, it is fundamental that there be a meeting of the minds as to all essential features of a contract."). However, "[p]ersons dealing at arm's length are entitled to contract on their own terms without the intervention of the courts for the purpose of relieving one side or the other from the effects of a bad bargain." *Commercial Real Estate Inv., LC v. Comcast of Utah II, Inc.*, 2012 UT 49, ¶ 38, 285 P.3d 1193 (citation and internal quotation marks omitted). And "[i]t is not [the court's] prerogative to step in and renegotiate the contract of the parties. Instead, . . . [courts] should recognize and honor the right of persons to contract freely and to make real and genuine mistakes when the dealings are at arms' length." *Id.* (citation and internal quotation marks omitted).

¶15   But in divorce cases, the ability of parties to contract is constrained to some extent by the equitable nature of the proceedings; therefore, "[t]he governing principle in our law is that contracts between spouses are enforceable and generally subject to ordinary contract principles so long as they are negotiated in good faith . . . and do not unreasonably constrain the [divorce] court's equitable and statutory duties." *Ashby v. Ashby*, 2010 UT 7, ¶ 21, 227 P.3d 246 (alterations in original) (citations and internal quotation marks omitted); *cf. Maxwell v. Maxwell*, 796 P.2d 403, 406 (Utah Ct. App. 1990) ("While a property settlement agreement is not binding upon a trial court in a divorce action, such agreement should be respected and given considerable weight in the trial court's determination of an equitable division of property."). And in determining the distribution of marital property in a divorce proceeding, "[t]he

overriding consideration is that the ultimate division be equitable—that property be fairly divided between the parties." *Newmeyer v. Newmeyer*, 745 P.2d 1276, 1278 (Utah 1987); *see also Englert v. Englert*, 576 P.2d 1274, 1275–76 (Utah 1978) (quoting Utah's divorce statute that governs the division of property and noting that "[t]he import of our decisions implementing [this] statute is that proceedings in regard to the family are equitable in a high degree"); *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 13, 176 P.3d 476 ("[T]he primary purpose of a property division . . . is to achieve a fair, just, and equitable result between the parties." (first alteration in original) (citation and internal quotation marks omitted)).

¶16    As pertinent to the case at hand, "marital property encompasses all types of retirement funds," including "any retirement fund accrued in whole or in part during the marriage." *Greene v. Greene*, 751 P.2d 827, 831 (Utah Ct. App. 1988); *see also Gardner v. Gardner*, 748 P.2d 1076, 1078–79 (Utah 1988) (noting that marital property includes pension funds acquired during the marriage or contributed to with marital funds). Because retirement funds are prospectively marital property if acquired or contributed to during the marriage, the distribution of such marital funds must fit within the overarching principle of equity unless the parties have freely and knowingly agreed to a different result that has been appropriately sanctioned by the court. *Cf. Woodward*, 656 P.2d at 432–44 (equitably dividing funds in a defined benefit pension plan); *Oliekan*, 2006 UT App 405, ¶¶ 25–28 (equitably dividing funds in both a defined contribution and defined benefit retirement plans); *Greene*, 751 P.2d at 831 (equitably dividing military retirement benefits).

## II. Division of Pension Benefits in *Woodward*

¶17    In Utah, the seminal case regarding division of pension benefits is *Woodward v. Woodward*, 656 P.2d 431 (Utah 1982). That case dealt with the division of a defined benefit pension plan belonging to the husband. *Id.* at 431. At the time of the

divorce, the husband had worked for fifteen years as a civilian employee for the federal government during which time he had contributed $17,500 to his pension plan. *Id.* Under the terms of the plan, if the husband left his government employment before completing thirty years of service, he would receive only the amount of his own contributions up to the time his employment ended. *Id.* But if he completed thirty years of service, the government would match his contributions. *Id.* The husband conceded that the wife was entitled to "one-half of the sum he ha[d] contributed during the fifteen years of their marriage" but argued that the wife "ha[d] no right or interest in the amount to be contributed by the government at the time of his retirement because that amount is contingent upon his continued government employment." *Id.* at 432. According to the husband, "because he cannot now benefit from the government's promised contributions to his pension plan at the time of retirement, the wife should not receive any portion of the benefits which are based on the government's participation." *Id.* The district court, however, determined that "because one-half of the 30-year period occurred during the marriage," she was entitled to a portion of any future matching contribution made by the government. *Id.* at 431–32.

¶18   In rejecting the husband's argument and affirming the district court's "equitable distribution" of his retirement benefits, *id.* at 433, our supreme court noted that in *Englert*, the court had "emphasized the equitable nature of proceedings dealing with the family, pointing out that the court may take into consideration all of the pertinent circumstances," including "'all of the assets of every nature possessed by the parties, whenever obtained and from whatever source derived[,] and that this includes any such pension fund or insurance.'" *Id.* at 432 (quoting *Englert*, 576 P.2d at 1276). Further, the court "recognize[d] that pension or retirement benefits are a form of deferred compensation by the employer" and that "[i]f the rights to those benefits are acquired during the marriage, then the [district] court must at least consider those benefits in making an equitable distribution of the marital assets." *Id.* Of particular

significance here, the court noted an important distinction between a retirement plan, such as a retirement account, whose present value is easily ascertainable (and thus divisible by two) and one, such as a defined benefit plan, whose value requires calculation:

> Long-term and deferred sharing of financial interests are obviously too susceptible to continued strife and hostility, circumstances which our courts traditionally strive to avoid to the greatest extent possible. This goal may be best accomplished, *if a present value of the pension plan is ascertainable*, by fixing the other spouse's share thereof, as adjusted for all appropriate considerations, including the length of time the pensioner must survive to enjoy its benefits, to be satisfied out of other assets leaving all pension benefits to the employee himself.
>
> On the other hand, where other assets for equitable distribution are inadequate or lacking altogether, *or where no present value can be established* and the parties are unable to reach agreement, resort must be had to a form of deferred distribution based upon fixed percentages.[4]

*Id.* at 433 (emphases added) (quoting *Kikkert v. Kikkert*, 427 A.2d 76, 79–80 (N.J. Super. Ct. App. Div. 1981)). The retirement plan at

---

4. Regarding the parties' conflict over the true meaning of "the *Woodward* formula," it is interesting to note that the quoted portion of *Woodward* actually contemplates two possible "formulas": one where the present value can be ascertained and there are sufficient assets to settle up and one where the present value cannot be ascertained or the lack of assets prevents an immediate distribution.

issue in *Woodward* was a defined benefit plan whose value required calculation at a future time: "other assets available for equitable distribution are inadequate, *and a present value of retirement benefits would be difficult if not impossible to ascertain* because the value of the benefits is contingent on the husband's decision to remain working for the government." *Id.* (emphasis added). Because "the husband must work for another fifteen years to qualify for the maximum benefits" and the maximum benefits would only be available after thirty years of employment, the court decided it was equitable to apportion the husband's pension benefits between the divorced spouses by applying a specific formula to the pension payments once he had actually retired or otherwise terminated his employment: "Whenever the husband chooses to terminate his government employment, the marital property subject to distribution is a portion of the retirement benefits represented by the number of years of the marriage divided by the number of years of the husband's employment. The wife is entitled to one-half of that portion . . . ." *Id.* at 433–34.[5]

¶19   Thus, the approach taken to divide the husband's retirement benefits in *Woodward* was the product of the court's intent to ensure an equitable result in the division of a retirement plan "where no present value can be established." *Id.* at 433 (citation and internal quotation marks omitted).

 III. Equitable Division of Husband's Defined Contribution Plan

¶20   This case presents quite a different situation from *Woodward*. The present value of the defined benefit plan in *Woodward* was "difficult if not impossible to ascertain," but the present value of the defined contribution plan here is readily ascertainable; the parties agree that it is $591,938.64.

---

5. More recently, in *Johnson v. Johnson*, 2014 UT 21, 330 P.3d 704, the supreme court referred to this method of the division of deferred pension benefits as the "'time rule' formula." *Id.* ¶ 26.

Accordingly, the present retirement benefit does not fit neatly into the *Woodward* calculation.

¶21 Nevertheless, Husband contends that Wife stipulated to using the *Woodward* formula, which he characterizes as a "term of art" that refers to the supreme court's conclusion about how the deferred benefit plan in that case ought to be divided to achieve the equitable goal—that is, one-half of "'a portion of the retirement benefits represented by the number of years of the marriage divided by the number of years of [Husband's] employment.'" (Quoting *Johnson v. Johnson*, 2014 UT 21, ¶ 26, 330 P.3d 704, which quotes *Woodward*, 656 P.2d at 433–34.) He argues that in this case the *Woodward* formula was necessarily applied to a defined contribution plan and that Wife should be bound to her agreement. Wife argues, however, that she understood that "dividing [the] retirement account[] pursuant to *Woodward* . . . mean[s] that the portion of the retirement account accumulated during the marriage shall be equally divided" rather than constrained by the specific mathematical formula set out in that case. Wife contends the district court erred by accepting Husband's calculation, which utilized a modified version of *Woodward*'s formula—substituting the entire corpus of a defined contribution plan as the multiplicand for the periodic payments due under a deferred benefit plan—that led to a result that, she argues, "was never intended by the *Woodward* court" and therefore violated *Woodward*'s underlying principle of equity. She contends that, as a result, she was awarded at least $30,000 less than she should have received had Husband's 401(k) account been divided equitably, based on its present value at the time of the divorce. Ultimately, Wife asks this court to remand this case for division of the retirement account in a way that is more in line with the general principles of equity set forth in *Woodward* by "determining the value of the defined contribution at the time of marriage, . . . subtracting this amount along with its appreciation from the balance at the time of divorce" and then dividing the contributions made during marriage. We conclude remand is appropriate.

¶22    We acknowledge that both Husband and Wife repeatedly asserted that Husband's 401(k) account was to be divided according to what they each referred to as "the *Woodward* formula." But none of their discussions, statements, or proposed stipulations contained a description or explanation of the actual mathematical mechanism that would be used to divide the defined contribution account at issue here. Rather, it was not until January 2014—approximately six months after the trial (and approximately three months after the district court entered the final divorce decree)—that Husband's counsel drafted the QDRO, disclosing to Wife for the first time the specific mathematical formula and actual calculations Husband's counsel had used to reach a final figure of $162,635.13, representing Wife's share of the retirement account.[6] At that time, Wife contended that she should draft a QDRO because she believed Husband's calculation had not followed the *Woodward* formula. But Husband retorted by repeating that he had calculated the account division according to the *Woodward* formula. Thus, the parties' views of what the *Woodward* formula amounted to with respect to Husband's 401(k) account were clearly divergent. Wife's counsel essentially conceded as much during a hearing when he said,

> I will admit that I stipulated to the *Woodward* formula. The problem that I've always had, and I guess I've had different results from all of the [c]ourts is basically it's always been my

6. Husband's counsel had included figures of "approximately $140,000.00" in a March 2013 settlement proposal and $147,844.22 in a trial brief, which purported to represent the amount of the proposed division of the retirement account as of the particular date. They differed from each other and from the final figure set out in the QDRO of $162,635.13, likely due to changes in the account balance from time to time. Even so, neither the settlement proposal nor Husband's trial brief described the calculation used to produce the figure.

> understanding the *Woodward* formula basically means you just divide whatever contributions were made to the retirement during the marriage.

And Husband's counsel conceded that before the QDRO, Husband had provided to Wife only total figures for the proposed division of the account without explaining the mechanism by which it had been calculated. This divergence of understanding is further illustrated by the fact that Husband's mathematical formula was not really the "formula" described in *Woodward*—nor could it be. *See Johnson*, 2014 UT 21, ¶ 26 (presenting a graphic displaying the *Woodward* formula as a mathematical equation); *Woodward*, 656 P.2d at 433–34 (presenting the formula in narrative form). Because the retirement account at issue here was a defined contribution plan and not a defined benefit plan as in *Woodward*, Husband had to make a critical modification so that his application of the *Woodward* formula would fit the differing circumstances.

¶23    *Woodward* stated that the spouse was "entitled to share in that portion of the benefits to which the rights accrued during the marriage." *Id.* at 433. And as we have explained, the formula described in *Woodward* was designed to take into account the unique aspects of a defined benefit plan—a plan where the benefit involves payments beginning at the commencement of a future retirement. *See id.* at 432–34. But by its very terms, the set of facts in which the *Woodward* formula was developed does not apply to a 401(k) retirement account like Husband's, where "a present value . . . is ascertainable," permitting equitable distribution in the way that *Woodward* described as optimal, rather than by a formula which was meant to be limited to situations where "resort must be had to a form of deferred distribution based upon fixed percentages" because better approaches were not available. *See id.* at 433 (citation and internal quotation marks omitted). And here, the fact that Husband had to modify the *Woodward* formula to fit—applying it to the present value of the retirement account rather than to the future pension payments for which it was designed—is

another indication that the talismanic recitation of "*Woodward* formula" by both parties in this case cannot be relied on as an expression of their clear agreement to either an approach or a result. Notwithstanding the bare agreement to "use the *Woodward* formula," there was no meeting of the minds here because neither Husband nor Wife contemplated application of the *Woodward* formula in the manner contemplated by the other. *See E.B. Wicks Co. v. Moyle*, 137 P.2d 342, 346 (Utah 1943) ("Both parties must assent to the same thing in the same sense . . . [; otherwise] there is no agreement." (citation and internal quotation marks omitted)).

¶24 We recognize that the *Woodward* formula may be subject to modification, and this court has previously upheld equitable divisions of marital property based upon a modified version of the approach taken in *Woodward*. For example, in *Oliekan v. Oliekan*, 2006 UT App 405, 147 P.3d 464, we determined that a district court properly applied a modified *Woodward* formula to two defined benefit plans that had been converted to lump sums prior to the divorce. *Id.* ¶¶ 5, 7, 28. We concluded in *Oliekan* that such an application was proper "despite the fact that *Woodward* concerned future retirement benefits and this case involves liquidated retirement funds." *Id.* ¶ 28. In doing so, we noted that the district court had adapted the *Woodward* formula in order to accommodate the retirement plans "because the benefits were converted to lump sums before the end of the marriage" and because "a significant portion of [the husband's] benefits accrued during the years the parties were married." *Id.* ¶ 27. We concluded that the district court "was clearly acting within its discretion," and affirmed the court's "attempt to apply the *Woodward* formula and, more importantly, its underlying rationale, to the facts of [the] case." *Id.* ¶¶ 27–28. As we have discussed, that "underlying rationale" was the goal of equitable distribution.

¶25 Thus, while the *Woodward* formula can be modified to adapt to varied circumstances related to a defined benefit plan, as was done in *Oliekan*, that division must still comport with the

general principles of equity. *See Johnson*, 2014 UT 21, ¶ 31 ("'The appropriate distribution of property var[ies] from case to case, [but] [t]he overriding consideration is that the ultimate division be equitable—that the property be fairly divided between the parties, given their contribution during the marriage and their circumstances at the time of divorce.' Thus, our precedent has endorsed a context-specific approach that recognizes the various ways marital property can be acquired and then distributed equitably." (alterations in original) (quoting *Goggin v. Goggin*, 2013 UT 16, ¶ 48, 299 P.3d 1079)). And despite the fact that "the district court is not bound by a specific prescribed approach in determining the most equitable distribution of pension benefits following the dissolution of a marriage," the court "should evaluate all relevant factors and circumstances in making such a determination." *Id.* ¶ 34. Here the district court did not. Based on Wife's calculations, it appears that she will receive less than she believes is her equitable portion of the marital property, and if true, Husband should not get a financial windfall at Wife's expense, unless this result was explicitly agreed to between the parties.[7]

¶26    As a consequence, we conclude the district court erred when it accepted the calculation Husband set forth in his QDRO.[8] *See id.* ¶ 23 ("We will disturb the [district] court's

_____

7. As mentioned before, Wife calculates her share of the retirement account to be $199,206.30. *Supra* ¶ 9. Husband calculates Wife's share of the retirement account to be $162,635.13. *Supra* ¶ 22 and note 5. This is a difference of $36,571.17, or approximately eighteen-percent less than what Wife believes her equitable portion to be. Whether Wife's calculation is correct or whether another distribution meets the requirements of equity under the facts is for the district court to determine on remand.

8. We briefly address Wife's claim that the district court erred in denying her "Rule 60 Motion" on the basis that it was untimely.

(continued…)

---

(…continued)

Rule 60 of the Utah Rules of Civil Procedure provides a mechanism for a party to obtain relief from a final judgment or order. Utah R. Civ. P. 60(b). In her motion, Wife did not identify the provision of the rule upon which she was relying, but styled her motion as a "Motion to Set Aside Decree of Divorce and/or Clarification" and argued that there was a mistake in how the QDRO was drafted because Husband "misinterpret[ed] and misappl[ied] the *Woodward . . .* formula to the current matter." It thus appears that Wife's argument would fall under rule 60(b)(1), which includes relief for "mistake," and therefore, to be timely, would have to be filed "not more than 90 days after entry of the judgment or order." *Id.* R. 60(c). Wife filed her motion ten days late. Thus, the district court denied Wife's motion as untimely under rule 60. Although the district court found Wife's motion untimely, Wife's motion was styled as a motion for the court to clarify its own divorce decree. Because Wife's motion arose based on the inclusion of the provision in the divorce decree to divide the retirement accounts in accordance with the *Woodward* formula, the decree was at best ambiguous and therefore *required* clarification from the court in the face of the actual QDRO, which brought this ambiguity to light for the first time. In other words, the problem with the court's distribution provision in the decree became apparent only when the actual implementation of the court's decree was to begin—not at the time of the decree itself. In effect, the divorce decree's division of the retirement account was not complete until the court signed the QDRO, and it was at that time that the implementation of the decree's general reference to the "*Woodward* formula" as the principle used for division of Husband's 401(k) retirement account actually acquired context and meaning. As discussed, the stipulation to use the *Woodward* formula as found in the divorce decree was not based upon a meeting of the minds between Husband and Wife and was therefore unenforceable. Accordingly, we see Wife's motion not as a rule 60 motion but as a motion for clarification in the face of the proposed QDRO, and

(continued…)

division only if there is a misunderstanding or misapplication of the law . . . indicating an abuse of discretion." (alteration in original) (citation and internal quotation marks omitted)). Thus, we remand this issue to the district court to determine the equitable apportionment of Husband's 401(k) retirement account as appropriate under the circumstances.[9]

¶27    Finally, Wife requests an award of her attorney fees incurred on appeal. "Generally, when the trial court awards fees in a domestic action to the party who then substantially prevails on appeal, fees will be awarded to that party on appeal." *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 52, 176 P.3d 476 (citation and internal quotation marks omitted). And "[a] party in a divorce appeal, in need of financial assistance, may be awarded attorney fees incurred in having to pursue an appeal." *Allred v. Allred*, 835 P.2d 974, 979 (Utah Ct. App. 1992) (citation omitted). The district court awarded Wife attorney fees at trial due to her financial need and Wife has substantially prevailed on appeal; accordingly, we award her attorney fees on appeal. *See Leppert v. Leppert*, 2009 UT App 10, ¶ 29, 200 P.3d 223 (concluding that [wife] was entitled to attorney fees on appeal because she had substantially prevailed on appeal, even though the issue on which she had prevailed required remand to the district court for further consideration). Accordingly, we remand to the district court to determine costs and attorney fees

_____

(…continued)

therefore it is not subject to the time constraints of rule 60. *See id.* R. 60(b). And because Wife's motion was filed on the same day as service of the proposed QDRO, we conclude that the motion was timely.

9. In this regard, if we have left any question about the issue, our decision here is not meant to endorse Wife's simple calculation as the appropriate result. Rather, the district court may determine an equitable result that it determines appropriate to the circumstances.

reasonably incurred by Wife in connection with this appeal and to make an appropriate award.

## CONCLUSION

¶28    The district court erred by accepting the calculation set forth by Husband in his QDRO. Therefore, we reverse and remand for further proceedings consistent with this decision.

———————