2025 UT App 7

# THE UTAH COURT OF APPEALS

WAXIES ENTERPRISES INC. AND
AMERICAN ZURICH INSURANCE CO.,
Petitioners,
*v.*
THOMAS J. HALLADAY AND LABOR COMMISSION,
Respondents.

Opinion
No. 20230789-CA
Filed January 16, 2025

Original Proceeding in this Court

Bret A. Gardner and Kristy L. Bertelsen,
Attorneys for Petitioners

Jay K. Barnes and Virginius Dabney,
Attorneys for Respondent Thomas J. Halladay

JUDGE RYAN D. TENNEY authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN FORSTER and DAVID N. MORTENSEN
concurred.

TENNEY, Judge:

¶1 Thomas Halladay was injured when he fell off a ladder while working for Waxies Enterprises (Waxies). Halladay filed a claim with the Labor Commission seeking compensation for his injuries, and the parties later reached a settlement agreement. After the parties had signed the agreement and the Labor Commission approved it, however, Waxies and Halladay learned that they had divergent ideas about how to interpret one of its material terms. When Waxies asked Halladay to sign certain documents that would effectively decide the question in its favor, Halladay refused.

¶2      Waxies then filed a motion asking the Labor Commission to compel Halladay to sign the requested documents. In the alternative, Waxies asked the Labor Commission to set aside its prior approval of the settlement agreement. The Labor Commission denied both requests.

¶3      Waxies now seeks judicial review. For the reasons set forth below, we decline to disturb the Labor Commission's decision on the motion to compel, but we vacate its denial of the motion to set aside its approval of the settlement agreement.


BACKGROUND

¶4      In November 2012, Halladay was working for Waxies when the ladder that he was standing on slid out from under him, causing him to fall and sustain injuries to his spine and the left side of his body. In late 2020, Halladay brought a claim against Waxies seeking an award of disability benefits.[1] The parties litigated the matter, and an administrative law judge (ALJ) found that causation had been established and awarded permanent total disability benefits to Halladay. The Labor Commission's Appeals Board (the Appeals Board) affirmed that decision.

¶5      Waxies sought review from this court, but the parties were directed to mediation. During that subsequent mediation, the parties agreed to the terms of a settlement agreement (the

---

1. American Zurich Insurance Co. was Waxies' insurance provider and is a named party. Waxies and American Zurich have litigated together throughout this case. For simplicity, we'll refer to them collectively as Waxies throughout this opinion.

Settlement Agreement), and the Labor Commission, through an ALJ, approved it two months later.[2]

¶6    The Settlement Agreement primarily consisted of two parts. First, Waxies agreed to pay Halladay a lump sum of $250,000, which represented "ongoing indemnity benefits" for Halladay because of his limited "ability to engage in substantial, gainful employment [going] forward." Second, Waxies agreed to provide a "Medicare Set-aside Allocation" (MSA) to cover Halladay's future medical expenses. The form and function of this MSA was laid out in the Settlement Agreement as follows:

- "[Waxies] will pay to [Halladay] the total of $166,246.47 . . . for future medical expenses related to the November 5, 2012 work accident . . . ."

- "It is further agreed by the parties that the MSA . . . of $166,246.47 will be paid to [Halladay] in the form of a structure[d] annuity. An initial MSA seed payment of $23,183.00 will be paid to [Halladay] by not later than 30 days from the date that the Utah Labor Commission approves this Settlement Agreement. Thereafter, annual annuity payments will be made to [Halladay] of $10,218.00 on the anniversary date of the initial payment and shall continue to be paid each year thereafter on or about the anniversary date and each anniversary date thereafter so long as [Halladay] lives."

- "The MSA of $166,246.47 is not guaranteed to be paid to [Halladay] in its entirety, and shall be paid to [Halladay] so

---

2. As will be discussed in more detail below, an ALJ has statutory authority to approve settlement agreements on behalf of the Labor Commission in workers' compensation cases. *See* Utah Code § 34A-2-420(4).

long as [Halladay] lives. No MSA annuity payments will be made after [Halladay's] date of death."

- "[Halladay] elects to have the MSA professionally administered for him by [third parties]."[3]

¶7 According to Waxies' subsequent account, "within a few hours" after the Labor Commission approved the Settlement Agreement, Waxies asked Halladay, for the first time, to sign two additional documents. One was titled the "Terms of Structured Settlement with Assignment" (the TSSA), and the other was titled the "Qualified Assignment and Release Agreement" (the QARA). Both of these documents contained language assigning Waxies' obligations to make the annual MSA payments to a third party. Moving forward, we'll refer to the two documents together as the Assignment Documents.

¶8 Of note, the TSSA described the MSA payments as "beginning 4/1/2024, paid for 14 years, only if . . . Halladay is living when the payment is due." And the QARA likewise described the MSA as a "Temporary Life Annuity" with periodic payments made "for a maximum of 14 year(s)."

¶9 After reviewing these documents, Halladay refused to sign them. And in discussions between the two sides' attorneys, it became clear that the two sides had differing ideas about whether these documents accurately reflected the nature of the Settlement

---

3. As noted, in this provision, Halladay agreed to have the MSA professionally administered by third parties. The Settlement Agreement did reference Halladay signing one document, a "Certified MSA Self Administration Support Service Agreement," and Halladay signed that document without incident. But this provision did not reference the assignment of the MSA, nor did it mention any other forms that might be necessary to carry out the third-party administration.

Agreement itself. In Waxies' view, because the Settlement Agreement said that Waxies would pay a "total" amount of $166,246.47 for "future medical expenses," with those medical expenses being paid to Halladay through the MSA, and because the Settlement Agreement also said that Halladay would receive an initial payment of $23,183.00 followed by annual annuity payments of $10,218.00, this meant that Waxies' obligations would end after 14 years.[4]

¶10    In Halladay's view, however, what mattered was that the Settlement Agreement specifically provided for "annual annuity payments" of $10,218.00 "so long as [Halladay] live[d]."[5] Because the Assignment Documents explicitly limited the overall MSA obligations to 14 years of payments, Halladay believed that they made "significant changes" to the Settlement Agreement's substantive terms. It was for this reason that, on the advice of counsel, he refused to sign them.

¶11    On May 9, 2023, Waxies filed a motion asking the Labor Commission to compel Halladay to sign the Assignment Documents. In this motion, Waxies argued that the Assignment Documents were necessary for the structured annuity to be funded and professionally administered. Because Halladay had agreed to have the MSA professionally administered by a third party, Waxies asked the Labor Commission to order him to sign

---

4. The actual total arrived at by adding $143,052.00 (14 times $10,218.00) to $23,183.00 is $166,235.00, not $166,246.47. Neither party mentions this minor discrepancy in their briefing, so we have no need to comment on it further.

5. In his brief to this court, Halladay accounted for the language limiting Waxies' obligations to $166,246.47 by suggesting that Waxies' obligations to make payments *to the MSA* were limited to that amount, and that it then had an obligation to make payments directly to him "for the remainder of his life."

those documents. In an alternatively filed motion to set aside, Waxies argued that, in the event that the Labor Commission refused to order Halladay to sign the Assignment Documents, the Labor Commission should set aside the Settlement Agreement entirely. In Waxies' view, the parties' disagreement about the scope of Waxies' obligations to pay Halladay's medical expenses showed that they had not agreed on "a material term" of how to settle Halladay's claims. And because the $250,000 payment was part of that same settlement, Waxies also asked the Labor Commission to order him to return those funds.

¶12    Halladay opposed these motions on several grounds. Of note here, with respect to the motion to compel, Halladay argued that the motion related to the enforcement of the Settlement Agreement but that the Labor Commission lacked jurisdiction to take any enforcement action.[6] And with respect to the motion to set aside, Halladay asked the Labor Commission to deny the motion because, in his view, the Settlement Agreement unambiguously "require[d] that yearly payments be made to . . . Halladay for life."

¶13    The same ALJ that had previously approved the Settlement Agreement denied both motions. With respect to the motion to compel, the ALJ concluded that it "lack[ed] jurisdiction to compel any party to sign a settlement agreement or any document related" to the Settlement Agreement. With respect to the motion to set aside the Settlement Agreement, the ALJ concluded that "the parties [had] reached an agreement" that had previously been approved, the "terms within the agreement [were] clear," and there was "nothing contained within the agreement which would warrant setting the agreement aside." While the ALJ

---

6. Halladay did indicate, however, that he would be willing to sign documents relating to an assignment if the documents were changed to reflect his view of Waxies' obligations relating to his medical expenses.

opined that the terms were "clear," it did not indicate whether it agreed with Waxies or instead Halladay on the key point of contention.

¶14 Waxies requested review from the Appeals Board, and the Appeals Board subsequently issued a decision affirming both aspects of the ALJ's order. First, on the motion to compel, the Appeals Board concluded that "[w]hile the [Labor] Commission's applicable statutes and rules permit settlement agreements, there is no corresponding language that would authorize the [Labor] Commission or the Appeals Board to compel a party to submit to terms of such an agreement." Second, on the motion to set aside, the Appeals Board concluded there had "been no cause shown for the Appeals Board to rescind or revisit its prior order" approving the Settlement Agreement. The Appeals Board acknowledged the "apparent gap" in the parties' positions on how long Waxies was required to make payments for the MSA, but the Appeals Board concluded that this did "not necessarily translate to nullification of the" Settlement Agreement. Instead, it concluded that it had "no authority to reform the parties' settlement agreement or to set it aside" and that it had "no role in dictating the type of financial instruments used by Waxies to fund its obligations."

## ISSUES AND STANDARD OF REVIEW

¶15 Waxies seeks judicial review of the Appeals Board's decision to affirm the ALJ's denial of Waxies' motion to compel Halladay's signature on the Assignment Documents or, alternatively, to set aside the Settlement Agreement. "Both of these issues present questions of statutory interpretation, and the [Labor] Commission's interpretation of a statute is a question of law, which we review for correctness." *Mayhew v. Labor Comm'n*, 2024 UT App 81, ¶ 33, 552 P.3d 235 (quotation simplified), *cert. denied*, 554 P.3d 1097 (Utah 2024).

ANALYSIS

I. Motion to Compel

¶16 Under the Workers' Compensation Act, a Labor Commission "administrative law judge shall review and may approve the agreement of the parties to enter into a full and final settlement." Utah Code § 34A-2-420(4). If a settlement agreement is approved, it becomes "the final order of the commission" unless a party appeals to the Labor Commission's Division of Adjudication. *Id.* § 34A-1-303(1); *see also id.* § 34A-1-102(2) (stating that references to the "Commission" in title 34A refer to "the Labor Commission"). As noted, an ALJ (and, by extension, the Labor Commission) approved the Settlement Agreement that's at the center of this case.

¶17 The first issue before us is whether the Labor Commission had authority to later compel Halladay to sign certain documents relating to the assignment of Waxies' obligations with respect to the MSA. The Labor Commission concluded that this request amounted to an enforcement action but that it lacked authority to enforce settlement agreements. We agree.

¶18 The Workers' Compensation Act specifies—under the heading of "Enforcing judgment"—that "an abstract of a final order of the [Labor Commission] providing an award may be filed . . . in the office of the clerk of the district court of any county in the state," and it then states that the "district court may issue an execution or a renewal on the order within the same time and in the same manner and with the same effect as if the order were a judgment issued by the district court." *Id.* § 34A-2-212(1)(a), (d). This statute creates the "mechanism" by which a party can "use the district court to enforce the payment of an award issued by the [Labor] Commission by filing an abstract of any final order providing an award with the district court." *Thomas v. Color Country Mgmt.*, 2004 UT 12, ¶ 10, 84 P.3d 1201 (quotation

simplified); *id.* (citing Utah Code section 34A-2-212(1)(a) as the appropriate means of enforcing a temporary disability award when a final order has been made). Moreover, Utah Code section 63G-4-501 creates additional means by which an administrative agency's orders can be enforced, and those mechanisms likewise call for "civil enforcement" of agency orders through the district courts.

¶19 Waxies points to no authority, and we have found none, that gives the Labor Commission authority to enforce settlement agreements itself. Instead, the relevant statutes suggest that enforcement actions are the province of the district courts. As a result, if Waxies is correct that the settlement requires Halladay to sign the Assignment Documents in order to effectuate the terms of the Settlement Agreement, Waxies must seek relief in the district courts. But because Waxies has not shown that the Labor Commission had authority to compel Halladay to sign the Assignment Documents as an exercise of enforcement power, we decline to disturb the Labor Commission's denial of Waxies' motion to compel.[7]

---

7. In its brief and again at oral argument, Waxies alternatively suggested that this court "has jurisdiction" itself "to enforce and compel execution" of the Settlement Agreement by ordering Halladay to sign the Assignment Documents. But Waxies provided no explanation or authority for its suggestion that this court can or should order this in the first instance. Waxies therefore has not carried its burden of persuasion, so we reject the request. *See State v. Draper*, 2024 UT App 152, ¶ 74, -- P.3d -- ("Under the Utah Rules of Appellate Procedure, a party must provide this court with an argument that explains, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal. These requirements are a natural extension of an appellant's burden of persuasion." (quotation simplified)).

## II. Motion to Set Aside

¶20 Waxies next argues that the Labor Commission (through the Appeals Board) erred by not granting the motion to set aside. In Waxies' view, the Labor Commission should have granted the motion once it became apparent that there had not been a meeting of the minds about how long Waxies was required to make MSA payments. Though a touch unclear, the Appeals Board seems to have concluded that it lacked authority to set aside the approval of the settlement on this basis. We disagree, so we accordingly set aside that decision.

¶21 By statute, "an administrative law judge shall review and may approve the agreement of the parties to enter into a full and final settlement" in a workers' compensation case, Utah Code § 34A-2-420(4), and the Utah Administrative Code sets forth procedures for the approval (or non-approval) of such agreements, *see* Utah Admin. Code R602-6-1 to -4. If an ALJ approves a settlement, that approval is "the final order of the commission" unless a party appeals. Utah Code § 34A-1-303(1).[8]

¶22 As an initial matter, Waxies suggests in its brief that its motion to set aside should be interpreted as "an appeal" "in the form of" a motion to set aside. But by statute, a party who seeks to "appeal the decision of an administrative law judge" must do

---

8. Waxies' motion asked the Labor Commission to set aside the Settlement Agreement itself. But the Labor Commission's prior role in this process was to issue an order *approving* that settlement. *See* Utah Code § 34A-2-420(4); Utah Admin. Code R602-6-1 to -4. That said, under Utah Code section 34A-2-108(1), without that approval, the agreement by Halladay to waive his "rights to compensation" would "not [be] valid." Thus, while we construe Waxies' motion as being a motion to set aside the prior approval of the Settlement Agreement, the ultimate effect would be the same.

so "by filing a motion for review with the Division of Adjudication within 30 days of the date the decision is issued." *Id.* § 34A-2-801(4)(a). The Settlement Agreement was approved on April 5, 2023, but the motion to set aside was not filed until May 9, 2023, which is a gap of 34 days. If this motion was meant to be an appeal, it was four days too late. *Cf. Price v. Labor Comm'n*, 2021 UT App 138, ¶ 23, 504 P.3d 723 (declaring a settlement agreement approved by an administrative law judge as "final" when it was not appealed to the Labor Commission within 30 days).

¶23 But Waxies also suggests that the motion was proper on its own terms as a motion to set aside the prior approval. In Waxies' view, the ALJ both could and should have granted the motion through an exercise of the Labor Commission's "continuing jurisdiction." As noted, the ALJ denied that request, and the Appeals Board later upheld that denial. In the view of the Appeals Board, there had "been no cause shown for the Appeals Board to rescind or revisit its prior order."

¶24 We disagree with the Appeals Board on this point, and our disagreement relates to the nature of the Labor Commission's continuing jurisdiction. In *Price v. Labor Commission*, we explained that the Labor Commission "retains continuing jurisdiction over workers' compensation cases, and 'may from time to time modify or change a former finding or order,' even after the thirty-day appeal window has passed." *Id.* ¶ 24 (quoting Utah Code § 34A-2-420(1)(b)). And as an initial matter, we explained that this continuing jurisdiction allows the Labor Commission to correct a past order for "clerical or other errors in an administrative decision," as well as in situations "where a claimant's medical condition deviates from its anticipated course." *Id.* (quotation simplified). Neither of those jurisdictional bases are at issue in this case.

¶25 Relying on a previous case from our supreme court, we further explained that the statutory "'grant of continuing

jurisdiction' is broader than, but 'encompasses, the authority that district courts have under rule 60' of the Utah Rules of Civil Procedure." *Id.* (quoting *Frito-Lay v. Labor Comm'n*, 2009 UT 71, ¶ 25, 222 P.3d 55). And in that case, our supreme court had noted that "the power of the [Labor Commission] as to its continuing jurisdiction is not limited to consideration of changes in physical condition of workmen, but is extended to the right to *rescind*, alter, or amend orders, decisions, or awards on good cause appearing therefor." *Frito-Lay*, 2009 UT 71, ¶ 25 (emphasis added, quotation otherwise simplified). Thus, while a challenge to the "propriety of [a] final legal determination[] made by the [Labor] Commission . . . must be brought through direct review and not by bringing another action upon the same cause," the Labor Commission's continuing jurisdiction does allow it to grant relief "for reasons similar to those set forth in rule 60 of the Utah Rules of Civil Procedure," *Price*, 2021 UT App 138, ¶ 25 (quotation simplified), and this includes the authority to "rescind" past orders for "good cause," *Frito-Lay*, 2009 UT 71, ¶ 25 (quotation simplified).

¶26 The procedural posture of this case is somewhat unusual as far as rule 60 motions relating to a contract dispute might ordinarily go. After all, if two parties to a contract have a disagreement about its meaning, that disagreement can be resolved through litigation, and a rule 60 motion would typically be filed after the parties had litigated the question and the court had thus analyzed and ruled on the contract's terms. Here, however, the parties have not yet litigated the question of how to interpret the Settlement Agreement. The role of the tribunal to this point has simply been the Labor Commission's decision to approve the agreement. But even so, rule 60 allows a party to obtain relief "from a judgment, order, or proceeding." Utah R. Civ. P. 60(b). We have no difficulty concluding that the approval of the agreement would constitute an "order" here.

¶27 Given this, the question is whether rule 60, or even some reason that is "similar" to reasons contemplated by rule 60, could

justify vacating a prior approval if it becomes clear that there was not a meeting of the minds. Surveying the cases, we agree with Waxies' contention that it could. Our decision in *Granger v. Granger*, 2016 UT App 117, 374 P.3d 1043, is perhaps the clearest example. There, the parties in a divorce action had stipulated that the district court should use the "*Woodward* formula" to determine how to divide their retirement accounts, and in the final divorce decree, the court ordered that this is how the accounts should be divided. *Id.* ¶ 4. But when the husband's attorney prepared the qualified domestic relations order (the QDRO)[9] and sent it to the wife's attorney, it became clear that the parties had very different ideas about what that formula entailed and how it would actually be applied to the accounts in question. *See id.* ¶¶ 5–8. The wife accordingly filed both an objection to the QDRO and a rule 60(b) motion, asking the district court to set aside the divorce decree in light of the parties' now-apparent disagreement about what the formula meant. *See id.* ¶¶ 6–7.

¶28    The district court denied the motion, but we reversed that denial on appeal. *See id.* ¶¶ 14–27. We noted that it "is a basic principle of contract law [that] there can be no contract without a meeting of the minds." *Id.* ¶ 14 (quotation simplified). We then held that although the wife had initially stipulated to a division of the accounts pursuant to the *Woodward* formula, the district court should have allowed her to set aside that stipulation once it became clear that the parties had never actually agreed on "the actual mathematical mechanism that would be used to divide" the retirement accounts. *Id.* ¶ 22. We thus held that there had been "no meeting of the minds" on this key point and that the ensuing litigation had made it clear that neither the husband nor the wife

---

9. A QDRO is an order that "furnishes instructions to the trustee of a retirement plan and specifies how distributions should be made, to whom, and when." *Granger v. Granger*, 2016 UT App 117, ¶ 5 n.3, 374 P.3d 1043 (quotation simplified).

had "contemplated application of the *Woodward* formula in the manner contemplated by the other." *Id.* ¶ 23. We accordingly remanded for further proceedings. *See id.* ¶ 26.

¶29   Though not a contract case, our supreme court's decision in *In re Discipline of Rasmussen*, 2013 UT 14, 299 P.3d 1050, is also instructive. There, a district court had issued an order suspending an attorney from practicing law. *See id.* ¶ 2. The attorney later filed a request for reinstatement, but the Office of Professional Conduct (OPC) filed a memorandum opposing that request. *See id.* ¶¶ 3–4. In response, the attorney argued that OPC's opposition was not timely filed, and the timeliness question he raised turned on how to interpret the original suspension order. *See id.* ¶ 5. If it was read one way, a particular rule applied and the opposition was timely filed; but if it was read another way, a different rule applied and it was not. *See id.* In considering the matter, the district court opined that the terms of its own initial suspension order had been "unclear," so the court accordingly allowed OPC to file the opposition. *See id.* ¶ 6.

¶30   The case later reached the supreme court. There, the supreme court held that OPC's opposition to the motion for reinstatement "was effectively a rule 60(b) motion"—and, more particularly, a motion under rule 60(b)(6), which allows for relief "based on 'any other reason justifying relief from the operation of the judgment.'" *Id.* ¶ 12 (quoting Utah R. Civ. P. 60(b)). In the supreme court's view, "the ambiguity in the suspension order created confusion," and "that confusion meant that each party was operating under a different set of expectations and a different timeframe." *Id.* In light of that confusion, the supreme court held that the district court's decision to allow OPC to file its opposition "was entirely appropriate under rule 60(b)(6) given these unusual circumstances." *Id.*

¶31   Applying these principles here, we conclude that when Waxies asked the Labor Commission to set aside the prior

approval of the Settlement Agreement, it did so for "reasons similar to those set forth in rule 60 of the Utah Rules of Civil Procedure." *Price*, 2021 UT App 138, ¶ 25. Again, Waxies' motion was based on its assertion that the parties never had a meeting of the minds about how long Waxies must make the MSA payments. And having reviewed the record and the parties' arguments, we conclude the basis for this assertion is clear enough: in one place, the Settlement Agreement states that Waxies is obligated to pay "the total of $166,246.47" to fund the MSA, but in another, the Settlement Agreement states that Waxies must pay an annual annuity payment of $10,218.00 "so long as [Halladay] lives." These provisions, as well as the parties' almost immediately divergent interpretations of them, together raise a cognizable claim of a failure of a meeting of the minds that should be addressed by the Labor Commission in the first instance.

¶32 Moreover, we note that our supreme court has explained that the Labor Commission's continuing jurisdiction should not be "burden[ed] with technicalities," and it has further explained that the Labor Commission's authority is intended to "empower the [Labor] Commission to prevent inadequate or excessive awards." *Frito-Lay*, 2009 UT 71, ¶ 28. But if it's true that there was no meeting of the minds in this case on a key term or terms, then the result could well be either an inadequate or an excessive award: if Waxies is forced to pay a large amount that it did not actually agree to pay, this would constitute an "excessive" award; but if Waxies is allowed to avoid paying an amount that it actually did agree to pay, the result would be an "inadequate" award. For this reason too, resolution of this question seems to be well within the nature of the Labor Commission's jurisdiction. *See Granite School Dist. v. Young*, 2023 UT 21, ¶¶ 34, 37, 537 P.3d 225 (explaining that the Labor Commission has "exclusive jurisdiction" "over the determination of the amount of a compensation award" (quotation simplified)).

¶33 Given these circumstances, we conclude that the Labor Commission had authority to rescind its prior approval of the Settlement Agreement once it was presented with a substantial question as to whether there had been a meeting of the minds on this material term. Because the Appeals Board ruled that it lacked such authority, we set aside that decision.[10]

---

10. We note one lingering issue that we choose not to resolve. Even with the continuing jurisdiction afforded to the Labor Commission, our courts have also recognized that there's still a "justified need for finality in administrative decisions." *Merrill v. Labor Comm'n*, 2009 UT 74, ¶ 17, 223 P.3d 1099 (quotation simplified); *accord Price v. Labor Comm'n*, 2021 UT App 138, ¶ 25, 504 P.3d 723. According to the supreme court, the Labor Commission's exercise of its continuing jurisdiction must accordingly be harmonized with principles such as "waiver and finality," which "are most applicable to settled cases." *Merrill*, 2009 UT 74, ¶ 18. In *Price*, we thus cautioned that "challenges to the propriety of final legal determinations made by the [Labor] Commission (or by an administrative law judge) must be brought through direct review and not by bringing another action upon the same cause," and we further stressed that "simple invocation of 'continuing jurisdiction' is not sufficient to justify any late challenge to all rulings rendered by the [Labor] Commission." 2021 UT App 138, ¶ 25 (quotation simplified).

In his brief before this court, Halladay argued that, to the extent that Waxies' motion to set aside was meant to be a request for direct review, it was untimely. As noted, we're persuaded by that argument. But we see no place (either below or on review) where Halladay has meaningfully briefed the separate question of whether the Labor Commission's exercise of its continuing jurisdiction is subject to any time limits of its own. Nor, for that matter, has Halladay meaningfully developed an argument that,

(continued…)

CONCLUSION

¶34    For the reasons set forth above, we decline to disturb the Labor Commission's decision not to compel Halladay to sign the Assignment Documents, but we set aside its decision that it had no power to potentially rescind the prior approval of the Settlement Agreement, and we instruct the Labor Commission to revisit this issue.

———————

because Waxies in theory could have filed a timely appeal from the approval of the Settlement Agreement, its failure to do so somehow foreclosed Waxies from instead asking the ALJ to set aside the approval as an exercise of the Labor Commission's continuing jurisdiction. We note that Waxies' brief sheds little light on these questions as well.

But these questions potentially implicate significant issues about the limitations (if any) on the Labor Commission's ability to exercise continuing jurisdiction in such circumstances. Without meaningful briefing, we decline to weigh in on them, instead leaving resolution of them for another case.